IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CRYSTAL G., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-1002-L-BH |
| | § | |
| KILOLO KIJAKAZI, | § | |
| ACTING COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge[1] |

<u>**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**</u>

Crystal G. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[2] denying her claims for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act. (*See* docs. 1, 22.)  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **REVERSED in part**, and the case should be **REMANDED** for reconsideration.

## I. BACKGROUND

On March 19, 2019, Plaintiff filed her applications for DIB and SSI, alleging disability beginning on August 28, 2018. (doc. 15-1 at 246.)[3]  Her claims were denied initially on July 10, 2019 (*Id.* at 134, 142), and upon reconsideration on December 6, 2019 (*id.* at 153-54).  On January 9, 2020, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 160.)  She appeared and testified at a telephonic hearing on September 10, 2020. (*Id.* at 35-63.)  On September

---

[1]By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2]At the time this appeal was filed, Andrew Saul was the Commissioner of the Social Security Administration, but Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration on July 9, 2021, so she is automatically substituted as a party under Fed. R. Civ. P. 25(d).

[3]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

23, 2020, the ALJ issued a decision finding her not disabled. (*Id.* at 28.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on November 16, 2020. (*Id.* at 235.)  The Appeals Council denied her request for review on February 25, 2021, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 6.)  She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

**A.    Age, Education, and Work Experience**

Plaintiff was born on September 22, 1981, and was 39 years old at the time of the hearing. (doc. 15-1 at 38, 246.)  She had attended special education classes and obtained a high school diploma, and she could communicate in English. (*Id.* at 277, 279.)  She had past relevant work as a security guard, a sales clerk, and a storage laborer. (*Id.* at 59.)

**B.    Medical, Psychological, and Psychiatric Evidence**

On January 14, 2019, Plaintiff presented to Catherine Martin, FNP, at Carevide with hypertension and abdominal pain. (*Id.* at 592-98.)  She reported fatigue, dizziness, visual disturbance, chest pain, abdominal pain with diarrhea, headache, and back pain. (*Id.* at 594.) Her body mass index (BMI) was 40.42. (*Id.*)  FNP Martin's assessment was tachycardia, palpitations, epigastric pain, high BMI, and diarrhea, and started her on Nexium. (*Id.* at 595-97.)

On February 6, 2019, Plaintiff returned to Carevide and was examined by FNP Martin for hypertension. (*Id.* at 799-805.)  She reported having an MRI done in 2010 that showed bulging discs at L3/L4, but she had never received joint injections or other surgical treatment. (*Id.* at 803.)  She could not work because her back pain was "so severe", and she had difficulty walking when her back was hurting. (*Id.* at 804.)  FNP Martin noted associated symptoms of chest pain, fatigue, headache, nausea, tinnitus, and chronic back pain. (*Id.* at 799.)  Her assessment was elevated blood

pressure, tachycardia, high BMI, and chronic low back pain with sciatica, other chronic pain, elevated cholesterol, and unspecified depression, and referred her for a neurology visit and MRI scan. (*Id.* at 803-04.)

At the same appointment, Plaintiff was examined by Licensed Clinical Social Worker (LCSW) Brittany Druckemiller for depression. (*Id.* at 806-09.)  She had been struggling with depression and chronic suicidal ideation for a long time but had not been on medication. (*Id.* at 806-07.)  She reported a history of domestic violence, physical and sexual abuse, and multiple instances of rape and molestation. (*Id.* at 807.)  In a mental status examination, Plaintiff demonstrated a euthymic mood and flat affect, and her thought content was depressive. (*Id.* at 807-08.)  She was assessed with severe recurrent major depression without psychotic features and prescribed Wellbutrin and Pantoprazole Sodium. (*Id.* at 808-09.)

On February 7, 2019, Plaintiff established care for hypertension with Ahad M. Hassan, M.D. (*Id.* at 565.) She reported intermittent episodes of left upper chest discomfort, intermittent shortness of breath with activity or exertion, minimal swelling of lower extremities, and intermittent palpitations. (*Id.* at 565.) Her blood pressure was elevated at 152/80, but her overall physical examination was normal; an electrocardiogram (EKG) showed a normal sinus rhythm with no acute ST-T wave changes. (*Id.* at 566.)  Dr. Hassan found essential hypertension, other chest pain, palpitations, shortness of breath on exertion, and hyperlipidemia. (*Id.* at 566-67.)  He ordered additional testing and started Plaintiff on Losartan Potassium, Nitroglycerin, aspirin, and Atorvastatin. (*Id.*)

On March 7, 2019, Plaintiff returned to Carevide with depression. (*Id.* at 810-15.)  She reported that functioning was somewhat difficult, and her symptoms included compulsive thoughts,

3

decreased need for sleep, depressed mood, difficulty concentrating, diminished interest or pleasure, excessive worry, fatigue, feelings of guilt, decreased libido, paranoia, and poor judgment. (*Id.* at 810.) FNP Martin noted that Plaintiff's score of 15 on the PHQ-9[4] was indicative of moderately severe depression. (*Id.* at 813.) She was continued on her medications and advised to consider counseling. (*Id.* at 814.)

On her return to Dr. Hassan March 14, 2019, Plaintiff underwent a nuclear stress test. (*Id.* at 562-64.) She denied any chest pain or any palpitations or fluttering in the chest, and her electrocardiogram changes were negative for ischemia. (*Id.* at 562.) Dr. Hassan's assessment was New York Heart Classification I,[5] limited by fatigue and leg discomfort. (*Id.*) Plaintiff's hypertension was fairly well controlled with a blood pressure reading of 142/64. (*Id.* at 563.)

On April 3, 2019, Plaintiff presented to Melanie Amber Book, PT, for physical therapy evaluation. (*Id.* at 715-17.) She reported having back pain since 2010, when she had fallen backwards onto concrete, that had worsened in the last six months. (*Id.* at 715.) She could not stand longer than five minutes or walk more than 100 feet without pain, and her children did most of the housework and grocery shopping. (*Id.*) PT Book noted decreased stance on the right, decreased stability, and decreased pelvic mobility during gait. (*Id.* at 716.) Plaintiff also had impairment of range of motion, strength, function, gait, and mobility with pain. (*Id.*)

---

[4]The PHQ–9 is a component of the Patient Health Questionnaire, which is one of the tools physicians use in assessing depression as well as selecting and monitoring treatment. *See* https://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/patient-health (last visited August 13, 2022).

[5]The New York Heart Association (NYHA) functional classification is an assessment tool used to classify patients in one of four categories based on their limitations during physical activity. Class I indicates no limitation in ordinary physical activity. *See* https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure (last visited August 13, 2022).

On April 30, 2019, Plaintiff returned to FNP Martin at Carevide with lower back pain. (*Id.* at 896-901.)  She reported that she "jarred" her back when she fell between the steps at a friend's house three weeks ago. (*Id.* at 896.)  She had sharp and shooting pain that radiated into her thighs and was aggravated by bending, changing positions, coughing, flexion, lifting, sitting, standing, twisting, and walking. (*Id.*)  Examination revealed lumbar spine muscle spasms and paraspinal tenderness. (*Id.* at 899.)  Plaintiff's BMI was 39.01, and her blood pressure was 138/92. (*Id.*)  FNP Martin noted that her score of 22 on the PHQ-9 was indicative of severe depression. (*Id.* at 896.)  She assessed chronic low back pain with sciatica and referred Plaintiff for neurology consultation and physical therapy. (*Id.* at 900.)

On May 11, 2019, Plaintiff presented to Peter Hong, D.O., for a consultative physical examination. (*Id.* at 701-11.)  She reported ongoing constant lower back pain that radiated down her right lower leg and limited relief from her pain medication. (*Id.* at 701.)  Any physical activity that increased her weight bearing status and prolonged standing worsened her back pain. (*Id.*)  Dr. Hong noted that her ability to function was limited because she was unable to lift anything more than five pounds and had difficulty doing household chores due to low back pain and limited range of motion. (*Id.*)  Examination revealed mild distress, a slow and antalgic gait due to right side low back pain, palpable right lumbar region muscle spasms, 4/5 left hip and leg muscle strength, 3/5 right hip and leg muscle strength, 4/5 right ankle muscle strength, decreased sensation to light tough in her right lower leg, positive straight leg raising on the right at 40 degrees while sitting and in the supine position, 1+ patellar and Achilles reflexes on the right, 3+ brachioradialis reflexes on the right, and tenderness to the lumbar spine and right paravertebral region. (*Id.* at 704-05.)  Plaintiff had difficulty with squatting and rising, getting on and off the examination table, and walking on toes and heels,

as well as an abnormal tandem walk and limited range of motion of the back and hips. (*Id.* at 705.)

Dr. Hong noted that Plaintiff could not lift or carry a light object or hop on one foot bilaterally due to lower back pain, which was most significant on the right side. (*Id.* at 705-06.)  A lumbar x-ray showed no spondylolysis or spondylolisthesis, but there was mild facet arthropathy at L4-5 and L5-S1 on the right and mild scoliosis convex left apex L3. (*Id.* at 706, 710.)  Dr. Hong diagnosed right-sided lumbar facet arthropathy, lumbar disc degenerative disease, mild lumbar scoliosis, and hypertension. (*Id.* at 706.) He opined that Plaintiff had limitations with standing and walking, lifting and carrying weight, and bending, stooping, crouching, squatting, reaching, grasping, handling, fingering, and feeling, due to lower back pain. (*Id.* at 706-07.)

Plaintiff participated in 11 physical therapy sessions between May 3, 2019 through June 7, 2019. (*Id.* at 718-51.)  At each session, she complained of increased back pain with all activities and had difficulty walking and balancing. (*Id.*)  She was discharged from physical therapy in June 2019, when her insurance "ran out," but she continued having pain in the low back and did not meet her goals in limiting it. (*Id.* at 751.)

On June 24, 2019, Plaintiff underwent a consultative psychological evaluation by Mac Walling, Ph.D. (*Id.* at 839-42.) She reported anxiety, mood swings, depression, and insomnia, and her depression medicine was not working. (*Id.* at 841.) In a mental status examination, Plaintiff had a dysphoric affect, she was anxious and briefly tearful, her mood was constructed with underlying sadness, and she was well oriented. (*Id.* at 840-41.)  Dr. Walling noted that she had borderline intellectual functioning and impoverished speech, could not perform serial 3s, had impaired remote and recent memory, and had impaired fund of general knowledge. (*Id.*)  He diagnosed recurrent and moderate major depressive disorder, unspecified neurocognitive disorder, alleged past history of

sexual abuse in childhood, and severe tobacco use disorder. (*Id.* at 842) Dr. Walling opined that Plaintiff presented in mild to moderate physical discomfort and psychological distress, and that her intellectual functioning was within the borderline range. (*Id.*) He concluded that her functional limitations based on psychological difficulties were moderately limited, but not precluded, in the ability to concentrate, persist, maintain pace, and remember work procedures; recall and carry out complex instructions; sustain a work routine for an extended period; cope with the stress of semi-skilled and skilled work; respond appropriately to criticism from a supervisor; and respond appropriately to changes in a routine work setting. (*Id.*) They were very good or unlimited in daily living and social abilities, however. (*Id.*)

On June 24, 2019, Plaintiff presented to LCSW Druckemiller at Carevide for psychotherapy. (*Id.* at 816-20.) She reported that her depression symptoms had not improved on her medications and she was "increasingly tired." (*Id.* at 817.) She had issues with distorted thought processes and believed that over-thinking and catastrophizing problems were contributing to her depression and anxiety. (*Id.*) Plaintiff was introduced to cognitive behavioral therapy concepts, continued on Wellbutrin, and started on Sertraline. (*Id.* at 817-18.)

On July 3, 2019, State Agency Medical Consultant (SAMC) Roberta Herman, M.D., completed a physical residual functional capacity (RFC) assessment based on the medical evidence. (*Id.* at 70-73, 85-88.) She opined that Plaintiff had the physical RFC to perform light work with the following limitations: lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit for about 6 hours in an 8-hour workday; push and pull unlimited weight (other than shown for lift and carry); frequently climb ramps and stairs, balance, kneel, crouch, and crawl; and occasionally stoop and climb ladders, ropes, or scaffolds. (*Id.* at 71-72, 87-88.) Dr. Herman opined

that Plaintiff's alleged symptoms were partially supported by the evidence of record. (*Id.* at 88.) On December 5, 2019, James Wright, M.D., another SAMC, examined the medical record and completed a physical RFC that mirrored that of Dr. Herman. (*Id.* at 105-08, 122-25.)

On July 9, 2019, State Agency Psychological Consultant (SAPC) Jean Germain, Ph.D., completed a Psychiatric Review Technique (PRT). (*Id.* at 69-70, 84-85.) She opined that Plaintiff had moderate difficulties in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (*Id.* at 69, 84.) Dr. Germain also completed a mental RFC assessment, opining that Plaintiff could understand, remember, and carry out only simple instructions; make simple decisions; concentrate for extended periods; interact adequately with co-workers and supervisors; and respond appropriately to changes in routine work settings. (*Id.* at 74-75, 89-90.) On December 6, 2019, SAPC Matthew Turner, Ph.D., examined the medical record and completed a PRT and mental RFC that mirrored those of Dr. Germain. (*Id.* at 103-04, 108-10, 120-21, 125-27.)

On July 30, 2019, Plaintiff presented to Dr. Hassan with rapid heart rate and fluctuating blood pressure. (*Id.* at 919-21.) She reported going to the emergency room with a blood pressure reading of 66/44 a few weeks prior, but she was discharged after the initial work-up was negative. (*Id.* at 919.) Since then, she had experienced fatigue, tightness in her chest, and shortness of breath with moderate activity. (*Id.*) Dr. Hassan noted that her underlying obesity contributed to the shortness of breath on exertion, and she began Verapamil for sinus tachycardia. (*Id.* at 920-21.)

At a follow-up with Dr. Hassan on August 29, 2019, Plaintiff reported feeling better on Verapamil, but she still had fatigue and shortness of breath with moderate activity, as well as poor sleep. (*Id.* at 916.) Review of systems and physical examination were normal, except for a history

of her present illness. (*Id.* at 917.)

On October 7, 2019, Plaintiff presented to Kristen Grable, M.D., at Lakes Regional Community Center (LRCC) for psychiatric evaluation. (*Id.* at 1035-43.) She reported depression with fatigue, insomnia, decreased concentration, weight gain, and morbid preoccupation. (*Id.* at 1035.) She also reported past history of sexual abuse by her stepfather, resulting in pregnancy at age 18. (*Id.* at 1038.) On mental status examination, Dr. Grable noted that Plaintiff had depressed mood and dysphoric affect; she was oriented times four, with fair insight and judgment and above-average intelligence. (*Id.* at 1039.) Dr. Grable diagnosed recurrent major depressive disorder, discontinued Sertraline, and started her on Venlafaxine. (*Id.* at 1042-43.)

On six occasions between November 7, 2019 and June 8, 2020, Plaintiff visited Dr. Grable for mental health treatment. (*Id.* at 991-1034, 1049-70.) Each time, she reported depressed mood, sad affect, weight gain, insomnia, fatigue, and decreased concentration. (*Id.* at 991, 1002, 1013, 1024, 1049, 1060) Dr. Grable made several adjustments to her medication regimen due to lack of response. (*Id.*)

On January 7, 2020, Plaintiff established care with Jean Latortue, M.D., for back pain, headaches, and joint swelling and myalgia. (*Id.* at 971-73.) Overall physical examination was normal. (*Id.* at 972.) Dr. Latortue assessed headache and spasm of back muscles, and prescribed Butalbital-acetaminophen and Cyclobenzaprine. (*Id.* at 973.)

On January 23, 2020, Plaintiff presented to Dr. Latortue with chest tightness, shortness of breath, fatigue, vertigo, bilateral hand numbing, and memory problems. (*Id.* at 969.) He noted that she was obese with a BMI of 45.8. (*Id.* at 968-69.)

Plaintiff returned to Dr. Latortue on February 4, May 7, May 21, June 4, and June 19, 2020,

with leg and low back pain. (*Id.* at 965-67, 1093-1102.)  Each time, she reported that her pain remained the same. (*Id.*)  On May 7, 2020, she reported that her back pain affected her legs and she was sometimes unable to walk. (*Id.* at 1104.)  Physical examination showed soft tissue swelling and limited motion, as well as spasms and decreased flexion of the cervical spine and spasms and tenderness on palpation of the lumbosacral spine. (*Id.*)  Dr. Latortue assessed neck pain, bilateral lumbago with sciatica, and low back pain. (*Id.* at 1105.)  On May 21, 2020, Plaintiff presented with restless legs syndrome and reported having more frequent charley horses. (*Id.* at 1101.)

On May 11, 2020, a lumbar spine x-ray showed mild left curvature of the mid lumbar spine and mild L4-5 and L5-S1 articular facet arthrosis. (*Id.* at 1109.) A cervical spine x-ray showed grade 1 anterior spondylolisthesis of C4 on C5 and C5 on C6, and loss of the normal cervical lordosis. (*Id.* at 1110.)

On May 18, 2020, Plaintiff established care for pain treatment at East Texas Family Support Clinic for Pain (East Texas Clinic); she was treated by Valerie Snyder, NP. (*Id.* at 1314-16.)  She reported severe chronic low back pain with spasms that worsened with exertion and caused difficulty walking at times. (*Id.* at 1314.)  On examination, she had cervical spine tenderness to palpation over the paraspinal musculature, which was made worse with extension and side bending, and lumbar spine tenderness to palpation over the paraspinous muscles, which was made worse with extension and side bending. (*Id.* at 1316.)  Although she had good strength, sensation, and range of motion in the lower extremities, she had some difficulty standing.  (*Id.*)  She had a PHQ-9 score of 12 and was referred for counseling. (*Id.* at 1315.) NP Snyder assessed chronic low back pain, chronic neck pain with headaches, and depression; she prescribed Tramadol, increased dosage of Gabapentin, and continued Cymbalta. (*Id.* at 1316.)

On June 15, 2020, Plaintiff returned to NP Snyder, and reported that Tramadol did not help her pain significantly. (*Id.* at 1316.)  Her physical examination was unchanged. (*Id.* at 1317.) Tramadol was discontinued, Gabapentin dosage was increased, and Cymbalta was continued. (*Id.* at 1318.)

On July 10, 2020, Plaintiff presented to Laurence Rosenfield, M.D., at East Texas Clinic with chronic low back pain and neck pain of 7/10. (*Id.* at 1318-20.) She reported severe pain with difficulty walking and that her daughter needed to provide assistance. (*Id.* at 1318.)  Dr. Rosenfield assessed chronic pain syndrome, chronic low back pain related to degenerative disc disease and facet arthropathy, lumbar articular facet arthritis, chronic neck pain with headaches related to cervical disc disease and facet joint arthropathy, and anterior cervical spondylolisthesis. (*Id.* at 1319.) He restarted Tramadol and refilled Gabapentin. (*Id.*)

On July 23, 2020, Plaintiff presented to Dr. Latortue with limited mobility and pain from a recent fall. (*Id.* at 1092.)  Examination showed cervical spine spasms, decreased cervical extension, reduced cervical range of motion, and thoracic spine spasms. (*Id.*)

On August 6, 2020, Plaintiff returned to Dr. Rosenfield for leg weakness, increased falls, and urinary/fecal incontinence. (*Id.* at 1322.)  The following week, Dr. Rosenfield administered lumbar medical branch blocks at L2, L3, L4, and L5 dorsal ramus right. (*Id.* at 1335-36.)

On August 13, 2020, Dr. Grable completed a mental medical source statement. (1240-45.) She opined that Plaintiff's mental functioning was "seriously limited and less than satisfactory, but not precluded in all circumstances", in the ability to maintain attention for two hour segments; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from

psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; deal with normal work stresses; interact appropriately with the general public; and concentrate, persist, or maintain pace. (*Id.* at 1242-43.) Her mental functioning was "limited but satisfactory" in the ability to remember work-like procedures; understand, remember, and carry out very short and simple instructions; work in coordination with or proximity to others without distraction; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in a routine work setting. (*Id.*) Dr. Grable opined that Plaintiff was expected to be absent from work more than four days per month on average as a result of her mental impairments. (*Id.* at 1244-45.)

On August 28, 2020, Dr. Latortue provided a physical medical source statement. (*Id.* at 1338-43.) He noted that Plaintiff had been diagnosed with lumbar lordosis, mild scoliosis, articular facet arthrosis at L4-L5, spondylolisthesis, and loss of normal cervical lordosis, with associated symptoms of back pain, restless legs, spasms, tenderness with pressure, and decreased movement. (*Id.* at 1338.) He opined that she could walk one city block without rest or severe pain, could sit and stand/walk less than two hours in an 8-hour work day, would need to take a 15 minute break every 45 minutes, would need to elevate her legs 30 degrees for 20% of a workday, would need to use a hand held assistive device, could occasionally lift and carry 10 pounds, could rarely twist and stoop, could never crouch or climb, could grasp and reach overhead 5% of the time, could fine manipulate and reach in front of her body 10% of the time, would be off task 20% of a workday, was incapable of low stress work, and would be absent from work more than four days per month. (*Id.* at 1339-43.)

He also opined that her anxiety would limit her efficiency. (*Id.* at 1343.)

**C.    <u>Hearing</u>**

On September 10, 2020, Plaintiff and a vocational expert (VE) testified at a telephonic hearing before the ALJ. (*Id.* at 30-58.)  She was represented by an attorney. (*Id.* at 37.)

### *1.    Plaintiff's Testimony*

Plaintiff testified that she last worked in August 2018, after moving to Texas to escape her abusive husband. (*Id.* at 39-40.)  She could not work now because she was unable to move around. (*Id.* at 42.)  She struggled getting out of bed and had difficulty walking, and her teenage children took care of everything at the house. (*Id.* at 43-44.)  She rarely left the house and would need to use a motorized cart for grocery shopping. (*Id.* at 44.)  She tried to do some cleaning, like washing dishes, but her children would do most household chores, like laundry. (*Id.* at 45.)  A motorized cart was ordered by her doctor, and she currently used a cane on her doctor's advice. (*Id.* at 45-46.)

Her hands were constantly numb and tingly, and she had lost a lot of grip strength. (*Id.* at 46.)  She could not walk a city block without stopping four or five times to rest for 10 to 20 minutes at a time. (*Id.* at 49.)  She would spend 80 to 90 percent of her day in bed. (*Id.* at 49-50.)  She could sit or stand and walk less than two hours a day and was able to lift a gallon of milk using both hands. (*Id.* at 50.)  She could not bend, twist, climb stairs, or climb ladders, and she needed to raise her legs while sitting because her feet and ankles would swell. (*Id.*)  She had trouble using her hands and fingers and would frequently drop things. (*Id.* at 51.)  She believed that her pain would cause her to be absent from work more than four days a month and to be off task more than 25 percent of the time. (*Id.*)  When she first moved to Texas, she had tried working at a hotel but was let go after five weeks because she was not physically able to do the work. (*Id.* at 52.)

Plaintiff had depression and anxiety, which resulted in no energy. (*Id.*) She was in special education all through school and had a second grade reading level. (*Id.*) She had trouble following and remembering instructions and could not mentally focus on a 30-minute television show. (*Id.* at 53-54.) She weighed 300 pounds, and had terrible self-esteem and thoughts of suicide. (*Id.*) She experienced migraine headaches and would wake up several times a night. (*Id.*) She also had bowel and bladder issues and would sometimes defecate and urinate on herself. (*Id.* at 55.)

### 2.    *VE's Testimony*

The VE testified that Plaintiff had previous work experience as a security guard, which was semi-skilled, light work with a SVP of 3; a sales clerk, which was semi-skilled, light work with a SVP of 3; and a storage laborer, which was unskilled, medium work with a SVP of 2. (*Id.* at 59.) A hypothetical person with the same age, education, and work experience history as Plaintiff would not be capable of performing her past work if she was limited to sedentary work with the following requirements or limitations: access to the bathroom three times a day at regular intervals with opportunity to change clothes; avoidance of unprotected heights, dangerous moving machinery, open flames, or bodies of water; simple, unskilled work involving a three-step process with no more than occasional changes to work processes and strategy; occasional bilateral overhead reaching; and frequent reaching, fingering, and handling with access to a cane to get around. (*Id.* at 59-62.) There were other available light jobs with a SVP of 2 that the hypothetical person could perform, including order clerk with 19,000 jobs nationally, final assembler with 26,000 jobs nationally, and document preparer with 93,000 jobs nationally, which were consistent with the descriptions in the Dictionary of Occupational Titles. (*Id.* at 59, 61.) If the same hypothetical person needed to lie down for at least an hour during the workday in addition to normal breaks, or would be off task more than 25

percent of the day and miss work more than four days a month, she would not be able to maintain and sustain any job in the national economy. (*Id.* at 62.)

D.    **ALJ's Findings**

The ALJ issued a decision denying benefits on September 23, 2020. (*Id.* at 16-28.)  At step one, he found that Plaintiff had met the insured status requirements through December 31, 2023, and had not engaged in substantial gainful activity since the alleged onset date of August 28, 2018. (*Id.* at 18.)  At step two, he found that she had the following severe impairments: degenerative disc disease, right foot and ankle degenerative joint disease, restless leg syndrome (RLS), obesity, headaches, hypertension, heart rhythm disorder (tachycardia), gastrointestinal reflux disease (GERD), depression, and anxiety. (*Id.* at 19.)  Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.*)

Next, the ALJ determined that Plaintiff retained the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), with the following limitations: lift or carry 10 pounds occasionally and five pounds frequently; stand or walk for two of eight hours during the workday; sit for six of eight hours during the workday; not work at unprotected heights, around dangerous moving machinery, open flames, and bodies of water; have required access to the bathroom three times per workday at regular intervals with the opportunity to change protective garments; occasionally reach overhead; frequently reach, finger, and handle bilaterally; be permitted a cane to access sedentary positions; and perform simple, unskilled (SVP 1 or 2, with one to three step processes) work. (*Id.* at 21-22.)  At step four, he found that Plaintiff was unable to perform her past work as a security guard, sales clerk, or storage laborer. (*Id.* at 26.)  At step five, the ALJ found

that although Plaintiff was not capable of performing past relevant work, considering her age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that she could perform. (*Id.* at 27.)  Accordingly, the ALJ found that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from August 28, 2018, the alleged onset date, through the date of his decision. (*Id.* at 28.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those

governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

17

*Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.  ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1. An ALJ must articulate in his decision his analysis of the persuasiveness of each medical opinion. The ALJ did not conduct a proper persuasiveness analysis for all of the medical opinion evidence as required by 20 C.F.R. § 404.1520c. Did the ALJ commit reversible error by failing to follow the regulatory requirements for evaluating medical opinion evidence?

2. An ALJ may not rely on his own lay opinion as to the limitations presented by a claimant's medical conditions. The ALJ did not identify any medical assessment that was the basis for his determination on the extent and severity of [Plaintiff's] physical limitations. Is the ALJ's RFC assessment, based upon his deficient lay interpretation of the objective medical evidence, supported by substantial evidence?

(doc. 22 at 5.)

### A.   Medical Opinion Evidence

Plaintiff contends that the ALJ did not make a specific finding on the persuasiveness of Dr. Hong's medical opinion as required under 20 C.F.R. §§ 404.1520c(b), 416.920c(b). (doc. 22 at 18.) The Commissioner responds that the ALJ considered supportability and consistency in relation to

18

his opinion. (doc. 25 at 13.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1529, 416.929. Every medical opinion is evaluated regardless of its source, but the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from his medical sources." *Id.* §§ 404.1520c(a), 416.920c(a).[6] A medical opinion is a statement from a medical source about what the claimant can still do despite his impairments and whether he has one or more impairment-related limitations or restrictions in the ability to perform common demands of work. *Id.* §§ 404.1513(a)(2), 416.913(a)(2).

The guidelines provide that the ALJ will explain in his determination or decision how persuasive he finds "all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* §§ 404.1520c(b)(2), 416.920c(b). "The measuring stick for an 'adequate discussion' is whether the ALJ's persuasiveness explanation enables the court to undertake a meaningful review of whether his finding with regard to the particular medical opinion was supported by substantial evidence, and does not require the [c]ourt to merely speculate about the reasons behind the ALJ's persuasiveness finding or lack thereof." *Cooley v. Comm'r of Soc. Sec.*, No. 2:20-CV-46-RPM, 2021 WL 4221620, at *6 (S.D. Miss. Sept. 15, 2021) (citations omitted). Five factors are considered in evaluating the persuasiveness of the medical opinion(s): (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other

---

[6]On January 18, 2017, the Administration updated the rules on the evaluation of medical evidence. *See* Fed. Reg. 5844, 5853 (Jan. 18, 2017). For claims filed on or after March 27, 2017, the rule that treating sources be given controlling weight was eliminated. *See Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)"). Plaintiff filed her application after the effective date, so the new regulations apply.

factors which "tend[s] to support or contradict the opinion." *Id.* §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5).  The most important factors to consider when evaluating the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency. *Id.* §§ 404.1520c(a), 416.920c(a).  Supportability concerns the degree to which the objective medical evidence and supporting explanations of the medical source support his own opinions, while consistency concerns the degree to which the medical source's opinion is consistent with the evidence from other medical sources and nonmedical sources within the record. *See id.* §§ 404.1520c(c)(1), (2), 416.920c(c)(1), (2).  The ALJ must explain how he "considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the] determination or decision." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).  He may, but is not required to, explain how he considered the remaining factors. *Id.*

When a medical source provides multiple medical opinions, the ALJ will articulate how he "considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors," but he is not required to articulate how he considered each medical opinion or prior administrative medical finding from one medical source individually. *Id.* §§ 404.1520c(b)(1), 416.920c(b)(1).  Although the ALJ evaluates the persuasiveness of the opinions when determining disability, the sole responsibility for a disability determination rests with the ALJ. *See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citation omitted).

Here, Dr. Hong physically examined Plaintiff on May 11, 2019, and provided a medical opinion about her limitations. (doc. 15-1 at 701-11.)  Plaintiff had reported being unable to lift anything more than five pounds as well as difficulty doing household chores due to low back pain

and limited range of motion. (*Id.* at 701.) Dr. Hong noted that she was in mild distress during examination; she had a slow and antalgic gait due to right side low back pain, palpable right lumbar region muscle spasms, 4/5 left hip and leg muscle strength, 3/5 right hip and leg muscle strength, 4/5 right ankle muscle strength, decreased sensation to light touch in her right lower leg, positive straight leg raising on the right at 40 degrees while sitting and in the supine position, 1+ patellar and Achilles reflexes on the right, 3+ brachioradialis reflexes on the right, and tenderness to the lumbar spine and right paravertebral region. (*Id.* at 704-05.) She also had difficulty with squatting and rising, getting on and off the examination table, and walking on toes and heels, and exhibited abnormal tandem walk and limited range of motion of the back and hips. (*Id.* at 705.) A lumbar x-ray showed no spondylolysis or spondylolisthesis, but there was mild facet arthropathy at L4-5 and L5-S1 on the right and mild scoliosis convex left apex L3. (*Id.* at 706, 710.) Dr. Hong diagnosed right-sided lumbar facet arthropathy, lumbar disc degenerative disease, mild lumbar scoliosis, and hypertension. (*Id.* at 706.) He noted that Plaintiff could not lift or carry a light object or hop on one foot bilaterally due to lower back pain, which was most significant on the right side. (*Id.* at 705-06.) He opined that she had limitations with standing and walking, lifting and carrying weight, and bending, stooping, crouching, squatting, reaching, grasping, handling, fingering, and feeling due to lower back pain. (*Id.* at 706-07.)

The ALJ found that Dr. Hong's opinion that Plaintiff had "limitations with lifting, carrying, bending, stooping, crouching and squatting due to lower back pain," was "vague" and "not a full assessment of [her] abilities." (*Id.* at 25.) He also noted that the opinion did not "account for his own testing that showed full strength and unassisted walking." (*Id.*) As discussed, the ALJ determined that Plaintiff had the RFC to perform sedentary work with no additional limitations for

bending, stooping, crouching, or squatting. (*Id.* at 21.) By implication, he found Dr. Hong's opinion on Plaintiff's physical limitations unpersuasive.

The ALJ's evaluation of Dr. Hong's opinion fails to comply with the requirements 20 C.F.R. §§ 404.1520c(b), 416.920c(b). Although he considered it, he "was also required to *explain* how persuasive he found [the] opinion, at least with respect to the factors of supportability and consistency." *William T. v. Comm'r of Soc. Sec.*, No. 6:18-CV-0055-BU, 2020 WL 6946517, at *6 (N.D. Tex. Nov. 25, 2020) (citing 20 C.F.R. § 404.1520c(b)(2)) (emphasis original). The ALJ failed to sufficiently explain "consistency," as he never discussed how Dr. Hong's opinion on Plaintiff's physical limitations was not consistent with other medical evidence. *See Cardenas v. Kijakazi*, No. 7:21-CV-0135, 2022 WL 2719044, at *7 (S.D. Tex. June 3, 2022), *adopted sub nom. by* 2022 WL 2715204 (S.D. Tex. July 12, 2022) (finding ALJ's failure to expressly address supportability factor "at all" was an error of law). Notably, 2019 physical therapy records indicated that Plaintiff had decreased stance on the right, stability, and pelvic mobility during gait, as well as impaired range of motion, strength, function, gait, and mobility with pain. (*Id.* at 716.) At each physical therapy session, she complained of increased back pain with all activities, and she had difficulty walking and balancing. (*Id.* at 718-51.) Dr. Latortue's treatment notes from between January and July 2020, indicated that her pain level remained the same and sometimes affected her ability to walk. (*Id.* at 965-73, 1090-1105.) While her physical examinations were generally normal, Dr. Latortue noted cervical spine spasms, decreased cervical extension, reduced cervical range of motion, and thoracic spine spasms in May and July 2020. (*Id.* at 1094, 1104.) The treatment records from East Texas Clinic also indicated walking difficulties from back pain, as well as findings of spinal tenderness made worse with extension and side bending. (*Id.* at 1314-16.) Because Dr. Hong's limitations

appear consistent with other medical evidence, the ALJ's failure to provide any discussion of the consistency of Dr. Hong's opinion "makes it impossible to determine whether [he] properly considered and weighed that opinion." *See Cardenas*, 2022 WL 2719044, at *8.

The ALJ also failed to sufficiently explain "supportability" when he noted that Dr. Hong's opinion "did not account for his own testing that showed full strength and unassisted walking." (doc. 15-1 at 25.) While Dr. Hong's examination indicated that Plaintiff had full strength on the left lower extremities and that she did not have an assistive device or prosthetic, it also noted that she had diminished strength on the right lower extremities, her gait was slow and antalgic, and she had difficulty squatting and rising, getting up and down, and walking on heels and toes, and abnormal tandem walking. (*Id.* at 704-05.) Although the ALJ may find that an opinion is unsupported by the medical evidence, "the ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). Because the ALJ only recited the examination findings that contradicted Dr. Hong's limitation findings without a substantive discussion of supportability, there is no "discernible logic bridge between the evidence and the ALJ's persuasiveness finding." *Pearson v. Comm'r of Soc. Sec.*, No. 1:20-CV-166-HSO-RPM, 2021 WL 3708047, at *5 (S.D. Miss. Aug. 11, 2021), *adopted by* 2021 WL 3663073 (S.D. Miss. Aug. 18, 2021); *see, e.g., Ramirez v. Saul*, No. SA-20-CV-00457-ESC, 2021 WL 2269473, at *6 (W.D. Tex. June 3, 2021) ("The ALJ failed to build a 'logical bridge' between the evidence on Plaintiff's ability to stand and walk, his rejection of the SAMCs opinions to that effect, and his ultimate determination that Plaintiff suffers from no limitations in this area."). Accordingly, the ALJ erred in failing to adequately explain how he specifically considered the factors of supportability and consistency in deciding the persuasiveness of Dr. Hong's opinion.

B.    **Harmless Error**

Plaintiff argues that the ALJ's error was not harmless because she would have been found

disabled had the ALJ conducted a proper evaluation of Dr. Hong's opinion. (doc. 22 at 27.)

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not

required" and a court "will not vacate a judgment unless the substantial rights of a party are

affected." *Mays v. Bowen*, 837 F.2d 1362, 1363-64 (5th Cir. 1988).  "[E]rrors are considered

prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's

decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).  In the Fifth Circuit, harmless error

exists when it is inconceivable that a different administrative conclusion would have been reached

absent the error. *Bornette v. Barnhart*, 466 F. Supp.2d 811, 816 (E.D. Tex. Nov. 28, 2006) (citing

*Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).  To establish prejudice that warrants remand,

Plaintiff must show that the ALJ's decision might have been different had he addressed or properly

considered Dr. Hong's opinions regarding her functional limitations. *See id.* at 816 (citing *Newton*,

209 F.3d at 458).

Here, had the ALJ properly evaluated Dr. Hong's opinions regarding Plaintiff's limitations,

he could have found additional limitations that would have affected her RFC determination, and/or

that she was precluded from her past relevant work and the jobs identified by the VE.  The ALJ's

error was not harmless because it is not inconceivable that he would have reached a different

decision had he found Dr. Hong's opinion as to Plaintiff's physical limitations persuasive. *See*

*Ramirez*, 2021 WL 2269473, at *7 (concluding reversal and remand was required where ALJ failed

to explain the persuasiveness of medical opinions as to standing and walking limitations as it was

impossible to determine whether ALJ's decision was supported by substantial evidence); *Cardenas*,

2022 WL 2719044, at *8 (concluding that ALJ's failure to sufficiently explain his consistency and supportability findings was prejudicial and required remand).  Remand should be required on this basis.[7]

## IV.  RECOMMENDATION

The Commissioner's decision should be **REVERSED in part**, and the case should be **REMANDED** for further proceedings.

**SO RECOMMENDED**, on this 16th day of August, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[7]Because the ALJ's determination of Plaintiff's RFC on remand will likely affect the remaining issues, they are not addressed.

25